**GRANITEVILLE COMPANY, Plaintiff,**

**v.**

**BLECKLEY LUMBER CO., et al., Defendants.**

Civ. A. No. 84–378–3–MAC (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

June 14, 1988.

Robert C. Hagler, Augusta, Ga., for plaintiff.

Robert W. Beynart, Atlanta, Ga., Carr G. Dodson, Macon, Ga., for defendants.

## ORDER

OWENS, Chief Judge.

The above-captioned case began as an action in interpleader initiated by plaintiff Graniteville Company ("Graniteville"), a manufacturing concern organized pursuant to the laws of South Carolina. Graniteville deposited $30,160.11 into the registry of the court and named as defendants and as potential claimants to the fund the following entities: (1) Bleckley Lumber Company d/b/a Bleckley Cotton Company ("Bleckley"), a Georgia corporation; (2) Dixie Bonded Warehouse & Grain, Inc. ("Dixie"), a Georgia corporation; and (3) Allstate Financial Corporation ("Allstate"), a Virginia

corporation. Neither Graniteville nor Bleckley have asserted any claim to any portion of the fund deposited in the registry of the court.

Defendant Allstate has moved this court for partial summary judgment on one of several theories propounded by defendant Dixie in support of its alleged entitlement both to the fund presently deposited in the court's registry and to monies previously paid to Allstate per a factoring arrangement with defendant Bleckley. While Dixie's theories of recovery include conversion, money had and received, estoppel, negligence and fraud, the instant motion concerns Dixie's claims for the proceeds from the sale of cotton as that claim is premised upon the Uniform Commercial Code ("UCC"), as the Code has been adopted in Georgia. *See* O.C.G.A. §§ 11–1–101, *et seq.*

In that plaintiff Graniteville is a mere stakeholder, minimal diversity exists among the claimants and the amount in controversy exceeds five hundred dollars ($500.00), this court properly may assert jurisdiction over this dispute. *See* 28 U.S. C. § 1335; Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1710.

## Background

At the time relevant to this lawsuit, Bleckley was engaged in the business of buying and reselling cotton. In June of 1983, Allstate entered into a financing arrangement with Bleckley whereby Allstate agreed to factor certain of Bleckley's accounts receivables. Bleckley and Allstate executed a security agreement and guaranty granting Allstate a continuing general lien and security interest in Bleckley's existing and future inventory and in all of Bleckley's existing and future accounts receivables. Further, Bleckley assigned to Allstate the accounts receivables against which Allstate advanced money. The arrangement between Bleckley and Allstate authorized Allstate to collect all of Bleckley's accounts directly from account debtors. The arrangement authorized Allstate to notify the account debtors of the assignment of accounts and to instruct the account debtors to pay the proceeds of existing and future accounts receivables directly to Allstate.[1] Allstate perfected its security interest by filing the appropriate financing statement with the Superior Court of Bleckley County on August 23, 1983.

Allstate placed Ms. Betty Snoop, a Bleckley employee, on its payroll as a bonded field employee to discharge certain certification functions. Ms. Snoop allegedly spoke frequently with Allstate personnel regarding Bleckley's activities, including the ordering and purchasing of cotton, and about Bleckley's financial condition. Dixie alleges that Bleckley operated its checking account on a zero-balance basis and that Allstate, after conversations with Ms. Snoop, deposited funds into Bleckley's account to cover checks written on that account. Thus, Dixie alleges that Allstate either maintained some measure of control over or had some knowledge of Bleckley's bank accounts and the balance therein. Ms. Snoop remained on Bleckley's payroll during this period.

Pursuant to a purchase order from Graniteville, Bleckley shipped seventy-seven bales of cotton to Graniteville's plant in Augusta, Georgia. Bleckley forwarded the sales invoice to Allstate, and Allstate advanced funds against the invoice. Bleckley had purchased the cotton ultimately delivered to Graniteville from Dixie with a check which was subsequently dishonored. Graniteville, faced with conflicting claims for payment from Allstate and Dixie, paid the amount due into the registry of this court and initiated this action in interpleader.

In addition to its claim for the sum presently deposited in the court's registry, Dixie has asserted claims to certain funds paid to Allstate pursuant to the factoring arrangement executed by Allstate and Bleckley. Bleckley purchased from Dixie cotton ultimately sold to Avondale Mills. Bleckley paid Dixie with a check, subsequently dishonored, for the sum of $28,344.37. Pursuant to the factoring arrangement,

---

1. By written notices, Allstate notified Avondale Mills, Dundee Mills and Graniteville Mills of Bleckley's assignment to Allstate of its accounts receivables.

Allstate forwarded money to Bleckley, and Avondale Mills paid Allstate. Dixie seeks to recover the amount paid by Avondale Mills to Allstate.

Similar transactions occurred between Bleckley and Blount's Bonded Warehouse ("Blount's").[2] Blount's sold cotton to Bleckley on at least two occasions. Bleckley tendered payment with checks subsequently dishonored in the amounts of $26,419.98 and $24,544.32. Allstate forwarded money to Bleckley upon receipt of the invoice, and the mills[3] which ultimately purchased the cotton from Bleckley paid Allstate. Blount's has assigned its rights to Dixie, and as assignee of those rights, Dixie asserts a claim against Allstate for the amounts paid to Allstate.

### Discussion

Defendant Allstate's motion for partial summary judgment presents a difficult question of law: whether the Uniform Commercial Code, as adopted by Georgia, affords a remedy to an aggrieved cash seller of cotton, a seller which has failed either to perfect a purchase money security interest or to exercise its rights of reclamation as those rights are outlined in the Code, against a secured party which has allegedly conducted itself in certain identifiable transactions in less than "good faith."[4] Defendant Allstate, cognizant that the question of "good faith" is "peculiarly a question for the trier of fact,"[5] argues that the question of good faith is irrelevant in this case because the UCC affords no remedy to an aggrieved cash seller which has failed to exercise its rights under the Code. Specifically, Allstate points to Dixie's failure to execute and perfect a purchase money security interest ("PMSI") which would have protected Dixie even against Allstate's prior perfected security interest. See O.C.G.A. § 11–9–312(3) and (4). Defendant Allstate further contends that neither section 11–2–507 nor section 11–2–702 is applicable in the instant dispute because those sections refer not to the reclamation of proceeds but to the reclamation of goods. See O.C.G.A. §§ 11–2–507 and 11–2–702. Finally, Allstate disputes Dixie's contention that O.C.G.A. § 11–2–403 is more than a definitional section and that it provides a remedy to aggrieved cash sellers. Allstate relies upon *Matter of Samuels & Co., Inc.*, 526 F.2d 1238 (5th Cir.1976)[6] and *Central Soya Company, Inc., supra* at n. 5.

This court has conducted a thorough study of both the labyrinthine provisions of the UCC and of the cases which have interpreted them. The definitive case in this area is *Samuels, supra*, and this court finds the analysis contained therein both comprehensive and persuasive.

In *Samuels*, the court decided that, under the UCC as adopted in Texas, the interest of an unpaid cash seller in goods already delivered to a buyer was subordinate to the interest of a holder of a perfected security interest in those same goods. *Id.* at 1241. While the court in *Samuels* considered many of the arguments raised by the parties in the instant case, there nonetheless exists a major factor which distinguishes the two cases. The Article Nine secured party in *Samuels* was found by both the referee in bankruptcy and the

---

**2.** Blount's is a seller of cotton at the same level of distribution as is Dixie.

**3.** The mills involved in these transactions were Dundee Mills of Griffin, Georgia, and Harriet and Henderson Mills of Barrington, Georgia.

**4.** This court does not imply that a mere allegation would suffice in opposition to defendant Allstate's motion for partial summary judgment. Rule 56 of the Federal Rules of Civil Procedure requires that the nonmovant go beyond the pleadings and by affidavits or by depositions establish that a genuine issue of material fact remains for determination by a jury. *See Celo-*

*tex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**5.** *Central Soya Company, Inc. v. Bundrick,* 137 Ga.App. 63, 66, 222 S.E.2d 852, 855 (1975).

**6.** In *Bonner v. Prichard,* 661 F.2d 1206 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent the cases decided prior to October 1, 1981, in the Fifth Circuit. In *Samuels,* after remand from the Supreme Court, the Fifth Circuit adopted as the opinion of the court an opinion originally written as a dissent to the panel decision. *See In Re Samuels & Co., Inc.,* 510 F.2d 139, 154–160 (5th Cir.1975).

district court to be a good faith purchaser for value. The per curiam decision of the Fifth Circuit, in adopting Judge Godbold's dissent as the decision of the court, specifically noted this finding. *Id.* at 1241, n. 3. The good faith of the Article Nine secured party, a fact underlying the analysis in *Samuels*, is vigorously contested in the instant case. The effect of that dispute upon the priorities of the claimants is the crux of this motion for partial summary judgment.

In analyzing the relative priority of the interests in *Samuels*, the court stated that "[i]f the Article Nine secured party acted in good faith, it is prior under § 2.403(a) to an aggrieved seller." *Id.* at 1243 (emphasis added). Clearly, the court placed great weight upon the "good faith" of the Article Nine secured party in resolving the priority question, and implicitly, the court indicated that an absence of good faith could well lead to a different result. *See Thompson v. United States*, 408 F.2d 1075, 1084 (8th Cir.1969) (good faith provision of the Code "permits the consideration of the lack of good faith by the Thompson entities [the secured parties] toward the government to alter priorities which otherwise would be determined under Article 9"); *Central Soya Company, Inc.*, 137 Ga.App. at 66, 222 S.E.2d at 855 (since good faith underlies the entire UCC, including Article 9, "a lack of good faith on the part of a secured creditor may alter the priorities which would otherwise be determined by Article 9 provisions"); *Central Bank of Alabama, National Association v. American Charms, Inc.*, 149 Ga.App. 218, 219, 253 S.E.2d 857, 858 (1979) (trial court correctly denied secured party's motion for summary judgment since a material issue of fact remains as to whether the bank acted in good faith).

■ This court agrees with the analysis in *Samuels* and the other above-cited cases and determines that the absence of good faith in the conduct of a secured party is a consideration which, if sufficiently established by the evidence, may result in a reordering of the priorities among creditors.[7] However, this conclusion does not end the inquiry. Defendant Allstate contends that the UCC provides no remedy for an aggrieved cash seller which has failed to utilize the mechanisms outlined in the Code to protect its interests. Allstate argues that O.C.G.A. § 11–2–403 does not create any remedy separate or apart from those remedies prescribed in O.C.G.A. §§ 11–2–507, 11–2–702 and 11–9–312.[8]

■ In *Samuels*, Judge Godbold analyzed the remedies available under the UCC to both aggrieved credit sellers and aggrieved cash sellers. He concluded that sections 2–702 and 2–703 (O.C.G.A. §§ 11–2–702 and 11–2–703) provided an exacting procedure by which an aggrieved credit seller may reclaim goods from a breaching buyer. However, "[t]hese provisions do not include or suggest a right or power in a cash seller to recover goods already delivered to a breaching buyer." *Matter of Samuels & Co., Inc.*, 526 F.2d at 1244. Judge Godbold further concluded that while section 2–507 (O.C.G.A. § 11–2–507) affords an aggrieved cash seller a right to recover goods from a breaching buyer, such right is subordinated to a buyer's good faith purchaser, including Article Nine lenders. *Id.* The rights of an aggrieved cash seller under § 2–507 are further restricted by the time limits imposed by § 2–507, Comment 3. That comment expressly requires that demand for return of the goods be made within ten days after receipt by the buyer. *Id.* at 1245. Finally, "§ 2.507 and § 2.702 [O.C.G.A. §§ 11–2–507 and 11–2–702] speak of a right to reclaim goods. Neither provision grants a

---

7. Indeed, the concept of good faith is a foundation of the UCC. "Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement." O.C.G.A. § 11–1–203.

8. *Samuels* does not resolve the question raised by the parties regarding the definitional or operational aspect of section 2–403 of the UCC. As quoted earlier, however, Judge Godbold made clear that under section 2–403 the Article Nine secured creditor prevails over an aggrieved cash seller only if that secured party acted in good faith.

right to go after proceeds of these goods." *Id.* Therefore, even if Dixie were able to establish an absence of good faith in Allstate's conduct, O.C.G.A. § 11–2–507 fails to afford Dixie a remedy in this situation.

However, Dixie's claim is not lost. The court in *Samuels* specifically found that section 2–401 (O.C.G.A. § 11–2–401) applies to cash sales and that the section was not merely definitional but operational. *Id.* at 1247. That section provides that a seller's interest upon delivery of the collateral to the buyer, in this case Bleckley, is limited to a security interest subject to Article Nine. As such, the validity of the secured party's interest is crucial. "If [the secured party] is the holder of a perfected Article Nine interest in the collateral claimed by [the seller] through its unperfected § 2.401 interest, [the secured party's] interest will prevail...." *Id.* at 1247. Conversely, if the secured party has acted in other than good faith, thereby vitiating its security interest, the UCC as interpreted in *Samuels* provides relief to the aggrieved seller, the holder of an unperfected section 11–2–401 interest.

Having determined that Dixie retains a remedy under the UCC,[9] this court must now consider defendant Allstate's motion for partial summary judgment in light of Rule 56 of the Federal Rules of Civil Procedure and the cases decided thereunder.

Rule 56(c) mandates the entry of summary judgment, upon motion, against a party who, after adequate time for discovery, fails to make a showing sufficient to establish the existence of any element essential to his case and upon which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Movant may discharge this burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554, 91 L.Ed.2d at 275. The court, however, must review the evidence and all factual inferences in the light most favorable to the non-movant. *Thrasher v. State Farm Fire Casualty Co.,* 734 F.2d 637, 638 (11th Cir.1984).

■ Not wishing to open a wide avenue upon which aggrieved sellers may attack the validity of security interests, this court has considered carefully the materials presented by the parties in support of their respective positions. This court concludes that defendant Dixie, through affidavits and depositions, has presented sufficient evidence to indicate that there remains for jury consideration a genuine issue of material fact. The good faith of a secured party "is obviously a material fact." *Shell Oil Co. v. Mills Oil Co., Inc.,* 717 F.2d 208, 213 (5th Cir.1983). The validity of Allstate's security interest, and thus its priority over Dixie, depends upon its having conducted itself in good faith. Dixie has placed Allstate's good faith in doubt. Dixie has presented evidence raising questions regarding the relationship of Bleckley, Betty Snoop and Allstate, the extent to which Allstate may have influenced certain purchasing and payment decisions and the degree of control which Allstate asserted over the balance in Bleckley's checking account. These factual disputes preclude this court from granting defendant Allstate's motion for summary judgment. Thus, that motion is hereby DENIED.

---

**9.** This court has determined that the UCC entitles Dixie to a remedy in the event Dixie can establish that Allstate acted in bad faith. The court has not relied upon *Cobb Exchange Bank v. Byrd,* 108 Ga.App. 825, 134 S.E.2d 871 (1964), a case heavily relied upon by Dixie. *Cobb Exchange Bank* preceded the adoption of the Uniform Commercial Code in Georgia. Thus, it no longer serves as binding precedent where there is a perfected security interest. *Central Soya Company, Inc.,* 137 Ga.App. at 66, 222 S.E.2d at 855–56.